UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DAVID LYNN, | : | CIVIL NO: 3:12-CV-01710 |
| | : | |
| Petitioner | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | (Magistrate Judge Schwab) |
| WARDEN JEROME WALSH, | : | |
| | : | |
| Respondent | : | |

## <u>REPORT AND RECOMMENDATION</u>

**I.  Introduction.**

     In 2008, the petitioner, John David Lynn, was convicted in the Court of Common Pleas of York County of two counts of burglary, multiple counts of theft, multiple counts of receiving stolen property, one count of resisting arrest, and one summary offense of criminal mischief.  His convictions arose out of a string of break-ins that occurred at local businesses in York County.  He was sentenced to an aggregate term of 7½ to 15 years in prison.

In this habeas corpus case, Lynn claims that his counsel provided ineffective assistance of counsel during his state criminal trial and appeal.   Lynn also claims that there was not sufficient evidence to convict him of one of the burglaries.   For the reasons discussed below, we recommend that the petition for a writ of habeas corpus be denied.

## II.  Background and Procedural History.

Lynn was charged in separate cases with offenses arising from numerous break-ins of businesses in York, Pennsylvania from December 25, 2006 to January 21, 2007.   The cases were consolidated for trial. *Doc. 13-4* at 76.[1]   Lynn filed a motion to suppress evidence, which was denied by the trial court. *See Doc. 13-1* at 12.   Prior to trial, the District Attorney *nol prossed* the charges relating to several of the businesses. *Doc. 13-1* at 141-42.   In March of 2008, Lynn was tried on the charges relating to five businesses—Choice Tobacco Outlet, Blue Moon Restaurant, Buy Rite Beer Distributor, Pizza Express, and Jim's Auto Repair.

---

1 Citations to page numbers are to the page numbers assigned by the Court's CM/ECF system, not to the page numbers on the underlying documents.

**A. The Trial Testimony.**[2]

**1. The Break-Ins.**

**a. Choice Tobacco Outlet.**

Rajendra Patel, a former employee of Choice Tobacco Outlet Store, testified

that at about 3:00 a.m. on Christmas 2006 he received a call from the alarm

company informing him that the alarm was going off at the store and that they

would inform the police. *Doc. 13-2* at 103-104.   According to Patel, after he went

to the store, he discovered that 15 to 20 cartons of cigarettes were taken. *Id.* at 105.

He testified that the burglar broke the lock on the door. *Id.*  Patel testified that the

store had video surveillance equipment and that he gave the police the videotape of

the incident. *Id.* at 104.  He identified numerous photos that were taken from the

video as accurate depictions of what was on the surveillance video. *Id.* at 107.

Patel testified that he never gave Lynn permission to enter the store after it was

closed. *Id.* at 109.

**b. Blue Moon Restaurant.**

Darrell Tobin, a co-owner of the Blue Moon Restaurant, testified that the

restaurant was broken into in January of 2007 and some garbage cans, bottles of

---

2  Because the strength of the evidence against Lynn is important with respect to
several of his habeas claims, we set forth the trial testimony in some detail.

3

liquor, food, and a jacket were taken. *Doc. 13-2* at 39-40 & 43.  He testified that

someone broke a window on the door to gain entrance. *Id.* at 40 & 48.  According

to Tobin, at least 20 bottles of liquor and several white, fifteen-gallon trash cans

were missing. *Id.* at 41.  He testified that he gave a list of the bottles of liquor that

were stolen to detective Fetrow, and he testified as to what was stolen. *Id.*  He

testified that the bottles of liquor at his bar have red pour spouts. *Id.* at 44.  Tobin

testified that anyone can purchase the red pour spouts at a restaurant supply store,

and the trash cans were purchased at Kmart or a dollar store. *Id.* at 49.

He identified a photo of a bottle of Jacquin's Crème De Cacao recovered by the

police as the same type he had in the bar and with a pour spout like those used at

the Blue Moon at the time. *Id.* at 47 & 51.  He also testified that he never gave

Lynn permission to enter his establishment or to take any liquor. *Id.* at 47-48.


### c. Buy Rite Beer Distributor.

Bryan Nelson, who works at the Buy Rite Beer Distributor, testified that in

January of 2007, someone broke into and robbed Buy Rite. *Doc. 13-2* at 83-84.  He

testified that a window was broken, and the change box, several cartons of

cigarettes, several cases of Heineken beer, a pack of lighters, a wastebasket, and a

promotional tin were stolen. *Id.* at 84 & 86.  According to Nelson, garbage that had

been in the wastebasket was strewn across the floor. *Id.* at 85.

### d. Pizza Express.

Jack Smith, the owner of Pizza Express, testified that in January of 2007, someone broke into his walk-in freezer. *Doc. 13-1* at 258 and *Doc. 13-2* at 3. He testified that the lock was broken off and the hasp was ripped off the freezer. *Doc. 13-2* at 4. According to Smith, there were pry marks to the door of the Pizza shop itself, but the burglar could not get in that door. *Id.* He testified that a bag of pepperoni and a clear plastic container of chicken were missing from the cooler. *Id.* Smith identified photographs of pepperoni and chicken later recovered by the police as that taken from his freezer. *Id.* at 5.

Jack Asper, a detective with the Northern York County Regional Police Department, testified that he was involved in the investigation regarding the suspected break-in at Pizza Express. *Id.* at 22-23. He testified that he went to Pizza Express and spoke with the owners, who showed him where the break-in had occurred. *Id.* at 23. He testified that the owners still had the hasp and lock that had been broken off the freezer. *Id.* According to Asper, he saw pry marks on the door to the actual business, but because it was a steel security door with a bunch of locks on it, the burglars were unable to get in. *Id.* He also testified that the pepperoni and chicken that had been stolen were later found in a freezer in the basement of Sherry Jones's residence, which was across the street from Pizza Express. *Id.* at 23-24.

### e. Jim's Auto Repair.

Gary Bankos, the owner of Jim's Auto Repair, testified that in the early morning hours of January 21, 2007, he received a call from the police informing him that it appeared that his business had been broken into. *Doc. 13-1* at 217.  He testified that when he went to his business, he found the office in shambles and garbage all over the place. *Id.* at 218.  Nine garbage cans and several white, five-gallon buckets were missing. *Id.* at 222.  Bankos also testified that tools, a Jeep Grand Cherokee, and state inspection and emission stickers were stolen. *Id.* at 218 & 227.  According to Bankos, the value of the items stolen was between $85,000 and $105,000. *Id.* at 225.  He testified that it appeared that someone had used a crowbar to pry the rear door open and that the hasp and latch of the door were broken. *Id.* at 219.  Bankos testified that he never seen Lynn before and that he did not give him permission to enter Jim's Auto Repair. *Id.* at 234.

### 2. Lynn's Arrest.

David Lash, a sergeant with the Northern York County Regional Police Department, testified that when he came on duty on January 21, 2007, he was informed that a 1996 Jeep Cherokee had been taken during the burglary of Jim's Auto Repair. *Doc. 13-1* at 240.  He testified that later that morning he observed a Jeep travelling southbound on North George Street, and he turned around to follow

it. *Id.* He found the Jeep in an alley, and he travelled down the alley toward the

Jeep at which time the Jeep began to back up and then it stopped. *Id.* According to

Lash, as he exited his vehicle, a struggle between the Jeep's driver, later identified

as Jeffery Clements, and the front seat passenger, later identified as Lynn, ensued.

*Id.* Lash testified that Lynn pushed and shoved Clements, and Clements eventually

opened the door and Lynn began to forcibly kick him out of the vehicle. *Id.* at 240-

41. Lash further testified that the backseat passenger, later identified at Robert

Bupp, also exited the vehicle, and Lynn got in the driver's seat and drove away. *Id.*

at 241.

Lash took Clements and Bupp into custody after he found them in the

backyard of a nearby home. *Id.* He searched Bupp and found a claw hammer,

razor knife/box cutter, an inspection license belonging to David Lauer, and a

baggie containing state emission and inspection stickers. *Id.* Lash also testified

that after he released Bupp and Clements to other officers who had arrived at the

scene, he began to look for Lynn. *Id.* He testified that he found the Jeep parked

near the garage door of a nearby car dealership. *Id.*

According to Lash, he later learned that Lynn was staying at the residence of

Sherry Jones, and Lash, along with other officers, went to and searched Jones's

house. *Id.* at 242. Lash testified that when he opened the door to the stairs to the

7

third floor of Jones's house, he saw Lynn on the roof looking through a window into the stairway. *Id.*  After a brief struggle, Lynn was arrested. *Id.*

Joseph Jones, a patrolman with the Northern York County Regional Police Department, testified that he assisted with the arrest of Lynn on January 21, 2007. *Doc. 13-2* at 7.  He testified that he and Sergeant Lash obtained the consent of a female at the residence where Lynn was staying to search the home. *Id.* at 7-8.  He testified about the struggle Lynn put up in being arrested. *Id.* at 8.  Jones testified that after Lynn was in custody, he searched Lynn and found a watch and a little baggie of marijuana on Lynn. *Id.* at 9.  According to Jones, he transported Lynn to headquarters and during the transport he read him his Miranda rights. *Id.* at 8-9. Jones testified that at headquarters he told Officer Allen that he had read Lynn his rights. *Id.* at 9.

### 3.  The Searches of Sherry Jones's House and Garage.

Todd Wise, a patrolman with the Northern York County Regional Police Department, testified that he also assisted in the arrest of Lynn on January 21, 2007. *Doc. 13-2* at 16.  He testified that, after Lynn was arrested, he went back to the property and obtained consent from the homeowner to search the detached rear garage. *Id.*  According to Wise, he found a bunch of tools in buckets and tools similar to those that would be found in a garage. *Id.*  He testified that he then

contacted his supervisor, who came and took photographs. *Id.* Wise also testified that Mr. Bankos was contacted, and after Bankos identified the tools, they were turned over to him. *Id.*

Sergeant Lash testified that Sherry Jones told the officers that Lynn's room was on the second floor at the top of the stairs of her house. *Doc. 13-1 at 243.* Lash testified that when he arrested Lynn he found a white, five-gallon plastic bucket containing numerous tools and a blue crowbar in Lynn's room. *Id.* Lash further testified that he went back to the residence on January 23, 2007, with detective Asper, and searched Lynn's bedroom and found a stack of inspection and emission stickers. *Id.*

Steven Crider, a detective with the West Manchester Township Police Department, testified that on January 29, 2007, he, along with others, searched Lynn's room in Sherry Jones's home. *Doc. 13-2 at 93-94.* He testified that they found a can, a garbage bag with some bottles of Heineken beer, some emission stickers, gloves, a jacket, potato chips, and cases of soda. *Id.* at 94. He also testified that he found an empty case of Heineken in the garage at Sherry Jones's residence. *Id.* He testified that the side door to the garage was ajar when he arrived, and he thought that the door could not be secured properly. *Id.* at 102.

Anthony Fetrow, a detective with the York City Police Department, testified that on January 29, 2007, he and other detectives searched Sherry Jones's

residence, with her consent, and they found in the second floor computer room a

bottle of Jacquin's Crème de Cacao, with a red pour spout. *Id.* at 75 & 76.  He also

searched the garage and found a white trash can, which he photographed. *Id.* at 76.

Fetrow further testified that when he searched Lynn's bedroom he found a jacket

like that worn by the suspect in the Choice Tobacco burglary. *Id.* at 110.  He

identified the jacket that he seized from Lynn's bedroom, and he described it as

having a blue tag on the back that says Super Triple Goose, a hood with flaps,

several pockets, and noticeable stains on the back. *Id.* at 112.


### 4. The Choice Tobacco Surveillance Video and Photos.

Detective Fetrow testified that he made a digital version of the VHS

surveillance video from Choice Tobacco, and then he printed out still photos from

that. *Doc. 13-2* at 113-114.  He testified that he adjusted the brightness and contrast

to create the still photos. *Id.* at 114.  According to Fetrow, the photos show the

suspect casing the store looking at various entry points, show a pry bar in the

suspect's hands, show the pry bar being used to pry open the side door, show the

suspect entering the store and in the store, show the suspect grabbing cartons of

cigarettes and leaving the store, show the suspect's coat including the blue tag and

stains on the back, and show the suspect's sneakers, which were white with blue

patches. *Id.* at 112, 115, 116, 118 & 119.

Fetrow testified that, when he met with Lynn after his arrest, Lynn was wearing sneakers that had white around the outside with light silver and blue patches. *Id.* at 118.   He testified that he compared the photos from the surveillance photos to the jacket and crowbar found in Lynn's bedroom. *Id.* at 114.   Detective Fetrrow testified that the blue tag and stains on the jacket seized from Lynn's room were noticeable on the jacket worn by the suspect on the video. *Id.* at 112.

### 5. The Return of Some Property.

Bankos testified that later on January 21, 2007, the police called him and told him that they had apprehended a suspect who told them the location of the tools stolen from Jim's Auto Repair. *Doc. 13-1* at 225.   According to Bankos, he met the police at a garage in an alley near Seventh Avenue and George Streets in York. *Id.*   There he found seven of his garbage cans, and his hand tools from the toolboxes in his shop were dumped on the garage floor. *Id.* at 225-26.   The police took photos and then gave the items back to Bankos. *Id.* at 226.   Bankos identified as belonging to Jim's Auto Repair the state inspection stickers and emission stickers that the police recovered. *Id.* at 227.   Bankos also identified a state inspection license belonging to one of his employees that had been stolen and that the police had recovered. *Id.* at 227-228.   He also testified that he got the Jeep back after the police found it in a parking lot of a car dealership. *Id.* at 235.   Detective

Asper also testified that he was involved in returning some inspection stickers to Mr. Bankos, who was able to verify that they were the ones stolen from Jim's Auto Repair. *Doc. 13-3* at 27.

According to Detective Fetrow, on January 30, 2007, he went to the Blue Moon Restaurant and asked Mr. Tobin if any trash cans had been stolen, and Mr. Tobin responded that three white trash cans had been stolen. *Doc. 13-2* at 77. Fetrow testified that the trash can that he found in Sherry Jones's garage was the same color and had the same label as the ones still at the Blue Moon. *Id.*  And he testified that Tobin identified the can found in Sherry Jones's garage from a photograph that Fetrow had taken. *Id.*  Fetrow also testified that Tobin identified the bottle of liquor with the pour spout that was found in Jones's computer room, and Fetrow turned the bottle over to Tobin. *Id.*

### 6. Sherry Jones's Testimony.

Sherry Jones testified that Lynn moved into her home in November of 2006 and that he stayed there on and off through January of 2007. *Doc. 13-2* at 54.  She testified that Lynn kept the door to his room shut and that no one was allowed in his room unless invited by Lynn. *Id.*  According to Jones, Robert Bupp also stayed with her a short time, Bupp did not have his own room, and Bupp usually slept on

the couch. *Id.*  Jones testified that Bupp would go into Lynn's room when Lynn was there and Lynn had invited him in. *Id.*

Jones testified that on one occasion, Lynn called her and asked her to pick him and his friend Maurice up from West York, and she refused. *Id.* at 56. According to Jones, later that evening, Lynn and Maurice came to the house and they each brought some liquor. *Id.* at 56.  She testified that they each brought two bottles that night including a bottle of Absolut Vodka that wasn't opened and another bottle that had a red pour spout. *Id.* at 57.  She testified that the next night Lynn brought home more than five additional bottles of liquor, some with pour spouts and some without. *Id.*  Jones was not sure of the date when Lynn brought the liquor to her house, but she testified it was between November of 2006 and January of 2007. *Id.* at 60.  She testified that a bottle of liquor with a red pour spout was found in her computer room on the second floor of her home, and she testified that it was one of the bottles that Lynn had brought. *Id.* at 64 & 65.  She testified the Robert Bupp, Lynn, and Milton Dean has access to the computer room on the second floor of her house. *Id.* at 61.

Jones also identified the jacket that the police took from Lynn's room as the jacket that Lynn wore. *Id.* at 65.  Jones testified that she never saw anyone else wear that jacket. *Id.*

13

Jones admitted that she pleaded guilty to retail theft in 2007 and that Robert Bupp was a codefendant involved in that retail theft. *Id.* at 57.

### 7. Milton Dean's Testimony.

Milton Dean testified that he knows Sherry Jones and that he goes to her house to hang out, party, and drink. *Doc. 13-2* at 70. He testified that he knows Lynn through Jones and that he saw Lynn at Jones's house. *Id.* He testified that around October of 2006 he saw Lynn with four or five bottles of liquor and that one of them had a red pour spout. *Id.* at 71. According to Dean, Lynn told him he got the liquor from where he worked. *Id.* at 74. Dean also testified that one night everybody at Jones's house was drinking beer and Lynn went to the refrigerator, which contained two six packs of Heineken, and gave him a beer. *Id.* Upon questioning from the court about honing in on the time that he saw Lynn with the liquor, Dean testified that it was during the time that Lynn lived at Jones's home. *Id.* at 72. The following exchange between the court and Dean then took place:

> THE COURT: Now, you also said you met Miss Jones, and you go over there and party with the rest of the guys drinking?
> THE WITNESS: Drinking, getting high, yeah.
> THE COURT: And what would you usually party with?
> THE WITNESS: Cocaine. They smoke marijuana.
> THE COURT: I don't need to know that, and maybe I should have been more specific. I don't care what you did. What I want to know is what you used to drink.

> THE WITNESS: I love cognac.  Tanqueray and
> everything was free.  I was drinking it.
>     . . .

*Id.* at 72-73.


### 8. Robert Bupp's Testimony.

Robert Bupp, who was also charged with burglary of Jim's Auto Repair and burglary and theft of Pizza Express, testified at Lynn's trial. *Doc. 13-2* at 143. Bupp testified that he met Lynn through Sherry Jones, and he testified that he also lived at Jones's house. *Id.* at 144 & 160.

Bupp testified that he was involved with the theft from Pizza Express, which is across the street from Sherry Jones's house. *Id.* at 148-149.  He testified that he and Lynn had scouted a generator in the area that they intended to steal, but because there were too many people in the area at the time, they abandoned that plan. *Id.* at 149.  Instead, according to Bupp, he and Lynn broke into the meat locker at Pizza Express and took some pepperoni and chicken, which they put in the freezer in the basement of Jones's house. *Id.* at 149.  When asked how he got into the locker, Bupp testified that the lock broke real easy. *Id.*

According to Bupp, he and Lynn also broke into Jim's Auto Repair, which is about two and half blocks from Sherry Jones's house, and they stole money, inspection stickers, and tools. *Id.* at 144, 145 & 148.  He testified that they pried

the back door open with a hammer. *Id.* at 145.  Bupp testified that Lynn threw the tools in a white, five-gallon bucket. *Id.*

Bupp testified that after he and Lynn left Jim's Auto Repair, they went to a bar, and Lynn tried to talk him into going back to Jim's Auto Repair to get a Jeep that was there.  *Id.* at 146.  Because he didn't want to go back to the scene of the crime, Bupp refused. *Id.*  Later the night, Bupp was at Sherry Jones's house when Lynn came back with the Jeep and wanted help unloading it. *Id.* at 146 & 157. Bupp testified that there were all kinds of tools from the garage thrown in garbage cans. *Id.* at 146.  According to Bupp, he, Lynn, and Clements unloaded the tools into Jones's garage, and they intended to sell the tools. *Id.* at 146-147.

Bupp testified that the morning after the burglary of Jim's Auto Repair, Lynn dropped him and a girl off in Leader's Heights. *Id.* at 167.  According to Bupp, at that time, Lynn went into a Rutter's store and stole items, and the lady at the cash register wrote down the license plate of the Jeep. *Id.* at 168.  Bupp testified that later that morning while he, Lynn, and Jeff Clements were driving in the Jeep, a police officer started chasing them, and they kind of tried to run but the officer pulled right in front of them. *Id.* at 145.  Bupp testified that Clements was driving, that Lynn was in the front passenger seat, and that he was in the back. *Id.* He testified about what happened then: "Jeff was like, ah, we're caught, so John [Lynn] was like, yeah, right, so he just kicked him out of the truck, and John

16

started to back up, and I jumped out, too, at the same time, and then John fled.  The

cops got me and Jeff at that time." *Id.*

When questioned by the court about why he stole the inspection stickers

from Jim's Auto Repair, Bupp testified that he did so because the stickers are

worth money. *Id.* at 164.  The following exchange between the court and Bupp

then took place:

> THE COURT:  Did you have any issue, you personally,
> that you would need to secure money in such a fashion?  Did
> you have a drug problem?
> THE WITNESS:  Yeah.
> THE COURT:  What was your drug of choice?
> THE WITNESS:  I smoked a lot of weed.  When I started
> hanging out at the house, everybody smoked crack.
> THE COURT:  Did you smoke crack?  I'm specifically
> asking about you, no one else.
> THE WITNESS:  Yes.
> THE COURT:  Did you smoke crack cocaine?
> THE WITNESS: That's the only reason we would
> burglarize stuff.

*Id.* at 164-65.  Bupp also testified that at the time the police stopped the Jeep, they

were going into town to get drugs. *Id.* at 168.

Bupp identified the crow bar seized from Lynn's bedroom as belonging to

Lynn. *Id.* at 147.  He testified that Lynn carried it around with him all the time.  *Id.*

He also testified that the crowbar was often at the front door, and, if it wasn't at the

front door, Lynn normally had it. *Id.*  Bupp also identified the jacket seized from

Lynn's bedroom as Lynn's, and he testified that he saw Lynn wear it a couple of

17

times. *Id.* at 147-148.  Bupp testified that he recognized the jacket in one of the

photos from the video surveillance tape from Choice Tobacco. *Id.* at 148.

According to Bupp, although he also wore that jacket a couple of times, he is not

the person in the surveillance video from Choice Tobacco. *Id.* at 159 & 163.

Defense counsel had Bupp put on the coat in front of the jury. *Id.* at 162.  Bupp

further testified that he recognized the hat in one of the photos from the

surveillance video as looking like Lynn's hat. *Id.*

Bupp testified that he saw Lynn with beer, that at one point they were

drinking a lot of Heineken, and that there were four cases of Heineken in the

garage, which Bupp thought Lynn put there. *Id.* at 149-150.  Bupp also testified

that one night Lynn brought home approximately 20 bottles of liquor in a recycling

bin. *Id.* at 150.  He testified the some of the bottles had red pour spouts, and some

of the bottles were brand new and not opened. *Id.* at 151.  According to Bupp, the

night that Lynn brought the liquor home, Lynn had called, said he was on West

Street, and asked Bupp to pick him up, but Bupp said he couldn't because he was

busy. *Id.* at 150.  Later that night, Lynn came home with the liquor. *Id.*

Bupp testified that he pleaded guilty to the Jim's Auto burglary and the

Pizza Express burglary as well as a burglary of Dressel Welding. *Id.* at 153.  He

also testified that he had one other open case pending sentencing. *Id.*  He testified

that the Commonwealth offered him a plea deal of 1½ to 7 years. *Id.* at 143.  He

also testified that he believed he was going to get consideration on his sentences for his testimony against Lynn and that he hoped that he would be going home. *Id.* at 154-155.

### 9. Lynn's Statements to Police.

Mark Allen, another patrolman with the Northern Regional Police Department, testified that on January 21, 2007, he took a statement from Lynn about the events of the previous evening. *Doc. 13-2* at 29-30.  He testified that Lynn mentioned several other people—Dawn, Sherry, Bobby, and Jeff—and he mentioned going to a bar, doing crack cocaine, and trying to buy crack cocaine. *Id.* at 30.  According to Allen, Lynn also mentioned helping another person unload a Jeep. *Id.*  Allen also testified that he took statements from Robert Bupp and Jeffery Clements, and Bupp and Clements signed their statements, which they had written themselves. *Id.* at 31.  But, Allen testified, Lynn said he did not want to write anything, and Lynn did not sign the statement that Allen had written about the interview. *Id.* at 30-32.

Detective Asper testified that the spoke with Lynn at the York County Prison on January 22, 2007. *Id.* at 24.  More specifically, he testified that, after he advised Lynn of his Miranda rights, Lynn said that there had to be a deal on the table, that he wanted to talk to an assistant district attorney, and that he was not

going to talk to a common police officer. *Id.* at 25.  According to Asper, at that

point, he advised Lynn that he was the detective and that any deals start with him.

*Id.*  When Asper got up to leave, Lynn told him to wait, and Lynn said that he

would provide information on some burglaries but only enough information so that

Asper could follow up and determine that he was telling the truth. *Id.*  Asper did

not testify about exactly what Lynn told him, but, he testified that Lynn provided

information on the burglaries at the Blue Moon, Pizza Express, and Buy Rite Beer

Distributor. *Id.*  According to Asper, although Lynn did not admit to taking part in

those burglaries, his mannerisms and the details which he provided led Asper to

believe that Lynn was involved. *Id.* at 25.  Asper admitted, however, that in his

affidavit of probable cause, he stated that Lynn had said he was only going to

provide the locations of burglaries and not who committed them. *Id.* at 26.


### 10. Alibi Witness.

The defense presented one witness—Vincent Rice—an alibi witness for the

Blue Moon Restaurant burglary.  Rice, who worked at the Economy Inn in January

of 2007, testified at trial that on January 8, 2007, Lynn stayed with him in his room

at the Inn because Lynn and his girlfriend had a fight. *Doc. 13-3* at 28-29.

**B. The Verdict and Sentence.**

At the close of the Commonwealth's case, the court granted a demurrer as to all charges associated with Buy Rite Beer Distributor. *Doc. 13-3* at 26. As to Choice Tobacco Outlet, the jury found Lynn guilty of burglary. *Id.* at 103. As to the Blue Moon Restaurant, the jury found Lynn guilty of receiving stolen property but not guilty of burglary and theft. *Id.* at 103-104. As to Pizza Express, the jury found Lynn guilty of theft and receiving stolen property, and the court found Lynn guilty of the summary offense of criminal mischief. *Id.* at 104 & 106. As to Jim's Auto Repair, the jury found Lynn guilty of burglary, two counts of theft (one as to the Jeep and one as to the tools), and two counts of receiving stolen property (one as to the Jeep and one as to the tools). *Id.* at 103-104. The jury also found Lynn guilty of resisting arrest. *Id.* at 104.

As to Choice Tobacco Outlet, the judge sentenced Lynn to 24 to 48 months for burglary. *Doc. 2-1* at 98. As to the Blue Moon Restaurant, the judge sentenced Lynn to 12 to 24 months for receiving stolen property. *Id.*. As to Pizza Express, the judge sentenced Lynn to 6 to 12 months for theft. *Id.* at 99. Noting that the receiving stolen property conviction merged for sentencing purposes with the theft conviction, the judge did not impose any sentence for the receiving stolen property conviction as to Pizza Express. *Doc. 2-2* at 1. He also imposed no sentence as to the criminal mischief conviction. *Id.* As to Jim's Auto Repair, the judge sentenced

Lynn to 24 to 48 months for burglary. *Doc. 2-1* at 98.  Noting that the theft

convictions and the conviction for receiving stolen property as to the tools merged

for sentencing purposes with the burglary conviction, the judge did not impose any

sentence for those convictions. *Id.*  The judge imposed a sentence of 24 to 48

months on the receiving stolen property conviction as to the Jeep. *Id.*  He also

imposed a concurrent sentence of 6 to 12 months for resisting arrest. *Id.* at 99.

Lynn's net sentence was 7½ to15 years imprisonment. *Doc. 2-2* at 1.


### C. Post-Sentence Motions, Appeals, and PCRA Petition.

Lynn filed post-sentence motions arguing among other things that there was

not sufficient evidence to convict him and that the receipt of stolen property

conviction as to the Jeep stolen from Jim's Auto Repair should have merged for

sentencing purposes with the burglary conviction. *See Doc. 2-2* at 7 & 12.  Those

motions were denied.

Lynn filed an appeal raising a number of claims including that there was

insufficient evidence to convict him. *Doc. 13-4* at 27-46.  The Superior Court

affirmed the judgment of sentence. *Doc. 13-4* at 79-91.  And, in April of 2010, the

Pennsylvania Supreme Court denied Lynn's petition for allowance of appeal. *See*

*Doc. 13-4* at 94.

After Lynn was unsuccessful on direct appeal, he filed a *pro se* Post

Conviction Relief Act (PCRA) petition, and the trial court appointed counsel. *See*

*Doc. 13-4* at 228.  After a hearing, an amended petition, and a second hearing, the

trial court denied Lynn's PCRA petition. *Id.*  Lynn appealed raising the following

three claims of ineffective assistance of counsel: (1) trial counsel was ineffective

for failing to request a jury instruction that the jury should not use Robert Bupp's

plea deal as substantive evidence against Lynn; (2) trial counsel was ineffective for

failing to seek post-sentence relief, based on *Naupe v. Illinois,* 360 U.S. 264

(1959), and *United States v. Bagley*, 473 U.S. 667 (1985), based on newly

discovered evidence that Robert Bupp's sentencing agreement was significantly

modified 12 days after Lynn's trial; and (3) counsel was ineffective by failing to

properly raise and challenge the issue of merger in post-sentence motions and on

appeal as to the receiving stolen property charge of the Jeep Cherokee from Jim's

Auto Repair. *Doc. 13-4* at 194.  The Pennsylvania Superior Court adopted, with

one minor exception relating to the merger claim, the PCRA court's opinion as its

own, and in January of 2012, the Superior Court affirmed the denial of Lynn's

PCRA petition. *Doc. 13-4* at 257-261.

**D. This Case.**

Lynn, proceeding *pro se*, filed the current petition for a writ of habeas corpus at the end of August of 2012, raising 16 claims.  Magistrate Judge Carlson ordered the respondent to respond to the petition in the manner required by Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts. After requesting and receiving an extension of time, the respondent filed a response to the petition addressing the merits of the four claims that Lynn properly exhausted.  The respondent also filed a motion to dismiss the other 12 claims contending that Lynn procedurally defaulted those claims.  Lynn then filed a reply to the response.

We appointed counsel to represent Lynn and ordered counsel to file a supplemental reply to the issues raised in the respondent's response and in the respondent's motion to dismiss.  After requesting and receiving extensions of time, Lynn's counsel filed a supplemental reply in which he withdrew three of the claims in the petition, addressed the merits of those claims that the respondent had addressed on the merits, and argued that a hearing is necessary as to the issue of procedural default of the remaining claims.  More specifically, although Lynn procedurally defaulted many of his claims by failing to pursue them in state post-conviction proceedings, he argued, his procedural default was excused under *Martinez v. Ryan,* 132 S.Ct. 1309 (2012), because his counsel in the post-

24

conviction proceedings provided ineffective assistance by not raising the claims of trial and appellate counsel's ineffectiveness.

Because we concluded that we needed to conduct a hearing on the issue of the ineffectiveness of post-conviction counsel, we recommended that the respondent's motion to dismiss be denied and that the case be remanded to us for a hearing on the issue of excusing Lynn's procedural default and for further proceedings as to the merits of those claims that have not been procedurally defaulted.  Judge Munley adopted that Report and Recommendation.

We held a hearing regarding procedural default and the ineffective assistance of post-conviction collateral counsel on November 12, 2013.  No evidence was presented at the hearing.  Instead, counsel for the parties entered into certain stipulations the result of which are that the court will address Claims 1, 2, 3, 4 & 6 on the merits, and on the existing record, and that all other claims are withdrawn.  Counsel requested, and we ordered, supplemental briefing on the remaining issues.  That supplemental briefing is now complete, and the case is ripe for decision.

## III. Discussion.

### A. State Prisoner Habeas Relief—The Legal Standard.

In addition to overcoming procedural hurdles, a state prisoner must meet

exacting substantive standards in order to obtain habeas corpus relief.  As amended

by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C.

§ 2254 limits the power of a federal court to grant a state prisoner's petition for a

writ of habeas corpus. *Cullen v. Pinholster,* 131 S.Ct. 1388, 1398 (2011).  A

federal court may not grant habeas corpus relief with respect to any claim that was

adjudicated on the merits in state court unless the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The standard under Section 2254(d) is highly deferential and difficult to

meet. *Cullen,* 131 S.Ct. at 1398.  It "reflects the view that habeas corpus is a 'guard

against extreme malfunctions in the state criminal justice systems,' not a substitute

for ordinary error correction through appeal." *Harrington v. Richter,* 131 S.Ct. 770,

786 (2011)(quoting *Jackson v. Virginia,* 443 U.S. 307, 332 n.5 (1979)(Stevens, J.,

concurring in judgment)).  It "'demands that state-court decisions be given the

26

benefit of the doubt.'" *Cullen,* 131 S.Ct. at 1398 (quoting *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002)).

Under Section 2254(d)(1), "clearly established Federal law" signifies the holdings, not the dicta, of Supreme Court decisions. *Howes v. Fields,* 132 S.Ct. 1181, 1187 (2012).  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen,* 131 S.Ct. at 1398.  Under the "contrary to" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id.* at 413.  "A court that unreasonably extends a rule in a new context or, in the alternative, unreasonably fails to extend a rule may also be deemed to unreasonably apply the correct rule." *Fischetti v. Johnson,* 384 F.3d 140, 148 (3d Cir. 2004).  But federal habeas relief may be granted only if the state court's application of clearly established federal law was objectively unreasonable. *Keller v. Larkins*, 251 F.3d 408, 418 (3d Cir. 2001).

"[A]n incorrect application of federal law alone does not warrant relief." *Id.* "[I]f the state-court decision was reasonable, it cannot be disturbed." *Hardy v. Cross,* 132 S.Ct. 490, 495 (2011).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter,* 131 S.Ct. at 786 (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).  "When assessing whether a state court's application of federal law is unreasonable, 'the range of reasonable judgment can depend in part on the nature of the relevant rule' that the state court must apply." *Renico v. Lett*, 559 U.S. 766, 776 (2010) (quoting *Yarborough,* 541 U.S. at 664).  "Because AEDPA authorizes federal courts to grant relief only when state courts act *unreasonably,* it follows that '[t]he more general the rule' at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—'the more leeway [state] courts have in reaching outcomes in case-by-case determinations.'" *Id.* (emphasis in original).

Under the "unreasonable determination of the facts" provision of § 2254(d)(2), the test "is whether the petitioner has demonstrated by 'clear and convincing evidence,' § 2254(e)(1), that the state court's determination of the facts was unreasonable in light of the record." *Roundtree v. Balicki,* 640 F.3d 530, 537-38 (3d Cir. 2011).  "[T]he evidence against which a federal court measures the

reasonableness of the state court's factual findings is the record evidence at the time of the state court's adjudication." *Id.* at 538.

The  highly deferential standard of review under §2254(d) only applies when the state court has addressed the claim on the merits.  When the state court has not addressed the claim on the merits, a *de novo* standard of review applies to legal questions and mixed questions of law and fact. *Collins v. Sec'y of Pennsylvania Dep't of Corr.*, 742 F.3d 528, 550 (3d Cir. 2014).  Any factual determinations made by the state court, however, are still presumed to be correct, absent clear and convincing evidence to the contrary. *Id.* (citing 28 U.S.C. § 2254(e)(1)).


**B.  Sufficiency of the Evidence Claim.**

Lynn claims that the evidence was insufficient to convict him of burglary with respect to Choice Tobacco Outlet.  At the time of the Choice Tobacco Outlet burglary, under Pennsylvania law, a person was guilty of burglary if he entered "a building or occupied structure, or separately secured or occupied portion thereof, with intent to commit a crime therein, unless the premises [were] at the time open to the public or the actor [was] licensed or privileged to enter." 18 Pa. Cons.Stat. § 3502(a).  Lynn contends that the evidence was insufficient to identify him as the burglar of Choice Tobacco Outlet.

Sufficiency-of-the-evidence claims are governed by the seminal case of *Jackson v. Virginia,* in which the Court held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319 (1979).  This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts," and under this standard the court must presume that the trier of fact resolved any conflicts in favor of the prosecution. *Id.* at 319 & 326.

When raised in the context of a habeas case after a decision on the merits by a state court, a sufficiency-of-the-evidence claim is subject to two layers of judicial deference. *Coleman v. Johnson,* 132 S.Ct. 2060, 2062 (2012).  First, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith,* 132 S.Ct. 2, 4 (2011).  Second, a habeas court may overturn a state court decision rejecting a sufficiency-of-the-evidence claim "only if the state court decision was 'objectively unreasonable.'" *Id.* (quoting *Renico v. Lett,* 559 U.S. 766, 773 (2010)).  "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.*

30

The Pennsylvania Superior Court addressed and rejected Lynn's sufficiency-of-the-evidence claim noting that "the photographs and surveillance films were admitted into evidence, and the issue of whether they accurately depicted [Lynn] was a matter to be decided by the jury." *Doc. 13-4* at 90.  Taken in the light most favorable to the prosecution, the trial testimony revealed that there was surveillance video that captured the Choice Tobacco burglary, and the jury was shown photos taken from the video.  A jacket, with distinctive markings, similar to the one wore by the burglar in the surveillance video was recovered from Lynn's room as was a crowbar similar to the one used by the burglar in the video.  And Detective Fetrow testified about the similarity of the sneakers worn by the burglar on the video and those worn by Lynn when he was arrested.  Bupp also testified that the hat worn by the burglar on the video resembled one worn by Lynn.  From this evidence, a rational jury could infer that Lynn was the person shown on the surveillance photos.

Lynn presented evidence and argument from which the jury could have concluded that Lynn was not the person on the video, i.e. that Bupp wore Lynn's coat on occasion, that the photos were not clear and the lightness and darkness of the photos had been adjusted, and that it was, in fact, Bupp that burglarized Choice Tobacco.  But it was within the province of the jury to ascribe whatever weight they determined was appropriate to that evidence and argument.  Despite that the

31

jury could have reasonably reached a different verdict, the evidence presented was sufficient for the jury to convict Lynn of burglary of Choice Tobacco Outlet, and the state court's conclusion to that effect is entitled to deference under AEDPA. Thus, "[a]ffording due respect to the role of the jury and the state courts," *Coleman,* 132 S.Ct. at 2065, Lynn's sufficiency-of-the-evidence claim fails.

In his petition, Lynn also contends that the elements of burglary where not established beyond a reasonable doubt because a charge of theft as to Choice Tobacco Outlet was mistakenly left off the jury slip and the Commonwealth did not prove that he intended to commit theft after entry.  The state court did not decide this issue.  Thus, our review is *de novo*.  Lynn's counsel did not brief the issue. *See Doc. 27* (issue not raised) and *Doc. 42* at 11 (Lynn's counsel states that Lynn specifically instructed him to reference the argument, but Lynn's counsel does not provide any substantive argument to support the contention that not giving a separate theft count to the jury means that that the elements of burglary were not proven).  In any event, the contention that the elements of burglary were not established beyond a reasonable doubt because a separate theft charge was not submitted to the jury is patently without merit.  The court was not required to give, and the jury was not required to decide, a separate charge relating to the crime Lynn intended to commit in the building after breaking in.  "That is because consummation or execution of the intent to commit a theft is not necessary to

complete the crime of burglary." *Crittondon v. Harlow*, CIV.A. 11-220 ERIE, 2012 WL 5336147, at *6 (W.D. Pa. Oct. 3, 2012)(report of magistrate judge recommending denial of habeas corpus petition raising claim that evidence was insufficient for a conviction of burglary where the jury found the petitioner not guilty of theft), *report and recommendation adopted*, 2012 WL 5336215 (W.D. Pa. Oct. 26, 2012).  And even where a separate charge is given to the jury, a defendant may be convicted of burglary even if he is acquitted of the crime that he purportedly intended to commit in the building. *See Id.*  Moreover, in this case, the photos taken from the surveillance video show the person who broke into Choice Tobacco Outlet stealing cigarettes.  As discussed above, there was sufficient evidence for the jury to determine that Lynn was that person.  Thus, there was sufficient evidence from which the jury could find that Lynn entered the store with the intent to commit the crime of theft.  Accordingly, his sufficiency-of-the-evidence claim is without merit.

### C.  Ineffective Assistance of Counsel Claims.

Lynn claims that his trial counsel provided ineffective assistance of counsel. More specifically, he contends that his counsel was ineffective for failing to request a jury instruction regarding Robert Bupp's guilty plea, that counsel was ineffective for failing to seek post-sentence relief based on a discovery violation

regarding the actual consideration given to Bupp for his testimony, that counsel was ineffective for failing to raise and challenge the issue of merger in post-sentence motions and on appeal, and that trial counsel was ineffective for failing to object, request a mistrial, or request a curative instruction when evidence regarding Lynn's prior bad acts, drug use, and unproved crimes was introduced.

The Sixth Amendment provides, in pertinent part, that " [i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence."  The purpose of the right to the assistance of counsel is to ensure a fair trial, and "the Court has recognized that 'the right to counsel is the right to the effective assistance of counsel.'" *Strickland v. Washington,* 466 U.S. 668, 686 (1984)(quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*  "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).  The clearly established federal law as to an ineffective-assistance claim is the standard set forth in *Strickland,* 466 U.S. at 687, which requires a two part analysis.

Under the first prong of *Strickland*, the petitioner must establish that counsel's performance was deficient. *Id.* at 687.  To do so, he must establish that

"counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. As such, the court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance," *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011)(quoting *Strickland,* 466 U.S. at 689), and "[t]o overcome that presumption, a defendant must show that counsel failed to act 'reasonabl[y] considering all the circumstances.'" *Cullen v. Pinholster,* 131 S.Ct. 1388, 1403 (2011)(quoting *Strickland,* 466 U.S. at 688). "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Richter,* 131 S.Ct. at 787 (quoting *Strickland,* 466 U.S. at 687).

Under the second prong of *Strickland*, the petitioner must establish prejudice. *Strickland,* 466 U.S. at 687. To do so, the petitioner must show a reasonable probability that, if not for counsel's errors, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster,* 131 S.Ct. at 1403 (quoting *Harrington,* 131 S.Ct. at 791).

To prevail on an ineffective assistance claim, a petitioner must satisfy both prongs of *Strickland*. A court can choose which prong of the standard to apply

first, however, and it may reject an ineffectiveness claim on the ground that the petitioner was not prejudiced without addressing whether counsel's performance was deficient. *Strickland,* 466 U.S. at 697.

"Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788.  When the state court has decided the claim on the merits, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)(quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).  "And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.*

## 1. Jury Instruction Regarding Bupp's Plea.

Lynn claims that his trial counsel was ineffective for failing to request a jury instruction that Robert Bupp's guilty plea could not be used as substantive evidence of Lynn's guilt, and, therefore, according to Lynn, he is entitled to a new trial on the Jim's Auto Repair and Pizza Express convictions.

The PCRA court addressed this claim on the merits.  It set forth the standard for deciding ineffective-assistance-of-counsel claims under the PCRA.  Although the Pennsylvania courts use slightly different language to articulate the ineffectiveness standard, the standard used by the Pennsylvania courts is consistent with the *Strickland* standard. *Werts v. Vaughn*, 228 F.3d 178, 204  (3d Cir. 2000)(concluding that the Pennsylvania courts applying the standard from Pennsylvania cases did not apply a rule of law that contradicts *Strickland* and finding that the state court's decision was not contrary to established Supreme Court precedent).  Thus, the state court's decision in this case was not contrary to clearly established federal law.  So we turn to whether the state court's decision resulted in a decision that involved an unreasonable application of clearly established federal law, *i.e., Strickland*.

The PCRA court noted that the jury was instructed as follows about using prior convictions to assess credibility:

> You've heard evidence that some of the witnesses may have been convicted of crimes involving dishonesty.  The only purpose you may consider these prior convictions for is that they might shed light upon whether or not you believe their testimony during the course of this trial.  If a person had previously been convicted of an offense involving dishonesty, that fact may assist you in gauging their testimony before you at trial.  Okay.  And you heard it, I think, referred to it the way we

refer to it the Latin term crimen falsi, okay.  Means a crime of
falsehood.

*Doc. 13-4* at 231.  It also noted, however, that the trial court did not give a special

instruction directing the jury not to use Bupp's guilty plea as substantive evidence

against Lynn. *Id.* at 232.  The PCRA court recognized that Lynn was entitled to a

proper cautionary instruction:

> It is well settled law that a co-defendant guilty plea
> cannot be considered as evidence against those who are on trial
> because the defendant has the right to have his guilt or
> innocence determined by the evidence presented against him,
> not by what has happened with regard to a criminal prosecution
> against someone else. Commonwealth v. Geho, 223 Pa.Super.,
> 525, 529, 302 A.2d 463, 465-466 (Pa.Super. 1973) (citing
> United States v. Restaino, 369 F.2d 544 (3rd Cir. 1966)).  Thus,
> it is incumbent upon the trial judge to give adequate and clear
> cautionary instructions to the jury to avoid the inference that a
> defendant is guilty by association. Id.

*Doc. 13-4* at 231-32.  The PCRA court determined that Lynn's counsel did not have a

tactical reason for not requesting a special instruction.  In this regard, the PCRA court

noted that Lynn's trial counsel testified at the PCRA hearing that she did not request

a special instruction because the questioning of Bupp about his guilty plea was

targeted to impeach his credibility rather than to link the plea to Lynn's guilt. *Id.*  But,

as the PCRA court further noted, counsel also testified that she simply did not think

about requesting a special instruction. *Id.*  Therefore, the PCRA court concluded that

trial counsel's reason for not requesting a special instruction was not based on any

tactical decision. *Id.*

The PCRA court then turned to the question whether Lynn was prejudiced by the fact that his counsel did not request a special instruction. *Id.* After reviewing some of the evidence presented at trial, the PCRA court concluded that Lynn had not been prejudiced:

> The point is that Appellant was found guilty of the crimes because of all the evidence presented during his trial. It is very unlikely that had this Court provided the jury with a special instruction regarding the co-defendant's guilty plea, the verdict would have been different. Hence, this Court concluded that Appellant was not prejudiced by attorney Walden's failure to request a special instruction. As a result, Appellant's PCRA petition was properly denied. Moreover, at trial, the Court gave an instruction to the jury explaining how the jury was to limit their consideration of the evidence as bearing solely on the co-defendant's credibility. As a result, Appellant's appeal regarding this issue is without merit.

*Id.* at 233.

Lynn asserts that the outcomes of the different charges against him demonstrate that he was, in fact, prejudiced by his counsel's failure to request an instruction that Bupp's plea not be used as substantive evidence against him. In that regard, he notes that the jury acquitted him of the two most serious charges as to the Blue Moon Restaurant and that the court directed a verdict in his favor as to the Buy Rite charges. But as to Pizza Express, Lynn was found guilty of theft, receiving stolen property, and the summary offense of criminal mischief, and as to Jim's Auto Repair he was found guilty of burglary, two counts of theft, and two counts of receiving stolen property. Lynn points out that Bupp testified that he and Lynn broke

into and stole items from Jim's Auto Repair and Pizza Express together, and he

contends that this testimony combined with Bupp's guilty plea impacted the

outcomes of those cases.  Lynn also points out that the prosecution highlighted

Bupp's testimony in its closing argument to the jury, and the prosecution argued to

the jury that in considering Bupp's credibility, it should consider that "his deal

entailed him pleading guilty to multiple felonious burglaries" and that he did not get

"off scot-free." *Doc. 27* at 32.  Lynn further asserts that the only direct evidence

against him as to Pizza Express and Jim's Auto Repair was Bupp's testimony.

       While Bupp's testimony was important, as noted by the PCRA court, there was

also circumstantial evidence against Lynn.  As to Pizza Express, the stolen pepperoni

and chicken were found in a freezer in the basement where Lynn was staying, and

Lynn gave a statement to police indicating that he had knowledge of the Pizza

Express burglary.[3]  As to Jim's Auto Repair, stolen tools and inspection stickers were

found in Lynn's bedroom, and additional stolen tools were found in the garage at the

residence where Lynn stayed.  Further, Lynn was spotted by the police in the Jeep

stolen from Jim's Auto Repair, and when confronted by the police, he kicked the

driver out of the Jeep and fled.  Also, as noted by the PCRA court, while the court did

not give a specific instruction that the jury may not use Bupp's plea as substantive

---

3 Lynn was not convicted of burglary as to Pizza Express.  Although Lynn had
been charged with burglary as to Pizza Express, the burglary charge was not given
to the jury.  As to Pizza Express, Lynn was convicted of theft, receiving stolen
property, and criminal mischief.

40

evidence of Lynn's guilt, it did instruct the jury about the proper use of prior convictions of the witnesses and that the jury may only consider such prior convictions in judging the credibility of the witnesses.

Given the totality of the evidence presented and the instructions given, under the "doubly deferential" standard that applies to a *Strickland* claim evaluated under 28 U.S.C. § 2254(d)(1), *Knowles*, 556 U.S. at 123, the PCRA court's determination that Lynn was not prejudiced by counsel's failure to request a special instruction regarding the use of Bupp's plea was not unreasonable.  Accordingly, Lynn is not entitled to habeas relief on this claim of ineffective assistance of counsel.[4]

### 2. The Actual Consideration Given for Bupp's Testimony.

Lynn contends that Bupp got a better plea deal from the Commonwealth than was disclosed by the Commonwealth at his trial, and he claims that his trial counsel was ineffective for failing to seek post-sentence relief after she discovered the actual consideration the Commonwealth gave Bupp for his testimony.

---

4  Although the state court determined that defense counsel did not have a tactical reason for not requesting a specific jury instruction regarding the use of Bupp's plea, the respondent asserts that defense counsel did, in fact, have a legitimate strategic reason for not doing so—it was her trial strategy to attack's Bupp's credibility and while Bupp's plea was legitimately admitted for that purpose, she did not want to highlight and draw the jury's attention to a potential wrongful use of the plea. *See Doc. 13* at 20.  Because we conclude that the state court's determination that Lynn was not prejudiced was not unreasonable, we need not, and do not, make any determination regarding that issue.

**a.  Bupp's Guilty Plea.**

On August 3, 2007, Robert Bupp pleaded guilty to multiple charges, in six different cases—one case concerned failure to register as a sex offender, two concerned retail theft, and the other three concerned the burglaries of Jim's Auto Repair, Pizza Express, and Dressel Welding Supply. *Doc. 3-2* at 34 & 40-43.  At the time Bupp pleaded guilty, his counsel and counsel for the Commonwealth represented on the record that there was a plea agreement for a sentence of 1½ to 7 years imprisonment on all cases. *Id.* at 35.  It was agreed, however, that Bupp would not be sentenced until after Lynn's trial. *Id.* at 34.

**b. Evidence and Argument at Lynn's Trial Regarding Bupp's Plea Agreement.**

Lynn's trial was held from March 3 to March 7, 2008. *See Doc. 13-1* at 129. During defense counsel's opening statement at Lynn's trial, she informed the jury that Bupp would be looking for consideration for his testimony against Lynn in his own sentencing. *Doc. 13-1* at 214-16 ("You'll also hear that Robert Bupp would have a great interest in pointing the finger at someone else because he would also be looking at potential consideration in his own sentencings for partaking in serving crimen falsi type crimes."; " . . . Robert Bupp, who seems to be the finger pointer in this where he again has an interest in a potential lesser plea to certain crimes he has pending before the Court currently."; "A lot of the information

42

received referencing my client regarding these crimes was from Mr. Robert Bupp, who had his own oats to sow and was looking for potentially a deal from the Commonwealth.").

Prior to Bupp testifying, his criminal history and plea deal were discussed at two sidebar conferences.  At the first sidebar conference, defense counsel requested to be able to question Bupp on the specifics of the charge relating to his failure to register as a sexual offender since, according to defense counsel, it was a crime of moral turpitude. *Doc. 13-2* at 37-38.  She also stated that she was not sure if Bupp was getting a deal on that charge. *Id.* at 37.  During this sidebar, the assistant district attorney stated that Bupp has four outstanding cases. *Id.*  The court then advised defense counsel that she could question Bupp about whether there is a deal and whether he subjectively believes he might receive favorable treatment based on his testimony. *Id.*  But as to whether defense counsel would be allowed to question Bupp on the specifics of the sex offense case, the court noted that defense counsel would have to provide him some authority before she would be allowed to do that. *Id* at 37-38.

The issue of Bupp's convictions was revisited at another sidebar later in the case but prior to the Commonwealth calling Bupp as a witness. *Doc. 13-2* at 123. At that side bar, the assistant district attorney pointed out that he had handed over crimen falsi information about Bupp to defense counsel.  *Doc. 13-2* at 123.  He

noted that Bupp was charged with three burglaries and is awaiting sentencing. *Id.*

He also stated that Bupp is awaiting sentencing on a sex case as well and that the

Commonwealth has not offered Bupp any deal on the sex case. *Id.*  At that point,

the court again stated that Bupp can be asked whether he subjectively believes that

he is going to receive consideration. *Id.*  The court ruled, however, that the sex

offense is not a crimen falsi crime, and therefore, defense counsel cannot inquire

into the nature of the offense. *Id.* at 123-24

The Commonwealth questioned Bupp about his plea at the beginning of his

testimony:

> Q: And did you just have a meeting with myself and Attorney
> Comery and Detective Fetrow back in the witness room?
> A: Yes.
> Q: And my understanding is that you were charged in two of
> these potential cases that Mr. Lynn is charged with, that you
> were charged in the Jim's Auto Repair burglary and that you
> were charged in the Pizza Express burglary and theft?
> A: Yes.
> Q:  And, in addition to those offenses, you have some prior
> criminal history in your past?
> A: Yes.
> Q: Okay.  And correct me if I'm wrong, on November 6, 1998,
> you were adjudicated delinquent as a juvenile for simple
> trespass, receiving stolen property, fleeing police officers, and
> theft?
> A: Yes.
> Q:  And in January of 2007, you pled guilty to a retail theft
> charge?
> A: Yeah.

Q: And in January of 2007, you pled guilty to a second retail theft charge?[5]
A: Yes.
Q: Now, what's your understanding of an offer from the Commonwealth in exchange for your testimony in this trial?
A: An offer?

*Doc. 13-2* at 143.  At which point, the court took over the questioning:

THE COURT: Is there any agreement between yourself and the Commonwealth in return for your testimony here today?
THE WITNESS: There was no written agreement, no.
THE COURT: Okay.  Was there any oral agreement between yourself and the Commonwealth?
THE WITNESS: Yeah.  They -- they offered me like -- it was one and a half to seven.
THE COURT: On the charges that you pled guilty to?
THE WITNESS: Yeah.
THE COURT: Okay.  And they were the two burglaries that you have spoken about?
THE WITNESS: Yes.
THE COURT: Okay.

*Id.* at 143-44.  And defense counsel, cross-examined Bupp regarding his plea and

plea deal:

Q:  Mr. Bupp, you testified that you pled guilty in the Jim's Auto burglary and the Pizza Express burglary, correct?
A:  Yes.
Q: And you also have a pending open case for pleading guilty to a Dressel Welding burglary, correct?
A: Yes.
Q: Do you have any other pending cases awaiting sentencing?

*Id.* at 153.  At that point, the Commonwealth objected on the basis that defense

counsel was attempting to elicit testimony that the court had already excluded. *Id.*

---

5 In fact, Bupp pleaded guilty to the retail theft charges in August of 2007, not January of 2007.

At sidebar, the court then instructed defense counsel to proceed by asking Bupp

whether he has one other open case and not to go any further. *Id.*  Defense counsel

then asked Bupp if he has one other open case pending sentencing, and Bupp

responded that he did. *Id.*  Defense counsel questioned Bupp further about his plea

deal:

> Q: And you testified that there was no written deal on the table
> between you and the DAs correct?
> A: Yes.
> Q: But there really is a deal there, because you - - you are
> pleading guilty, and testifying on behalf of the Commonwealth
> against my client.  It's your belief that you're going to get
> consideration on your sentences, isn't that true?
> A: Yes.
> Q: And, in fact, you feel you're going to go home, don't you?
> A: I'm hoping to go home.
> Q:  Isn't it true that you have said before that you think you're
> going - - that you're going to go home for testifying against my
> client?
> A: I don't know if I'm going home or not.
> Q: Isn't that what you're hoping for?
> A: Yeah.
> Q: And that's what you're thinking you're going to get?
> A:  I said, yeah, that's what I'm hoping for.

*Doc. 13-2* at 154-155.

During closing arguments, both sides referenced Bupp's plea agreement and

deal.  Defense counsel stated:

> In this case, you have the testimony of Robert Bupp.
> Again, I indicated that you were all the finders of credibility.
> You determine credibility.  I submit to all of you that his
> testimony was incredulous.  You all heard, I believe I am
> getting a deal.  Of course, he believes he's getting a deal.  He

46

wouldn't sit up there and testify if he didn't think he was getting a deal.

He has four pending charges, four pending guilty pleas. He's pled guilty to Jim's Auto being one of them. He's already pled guilty, and you know what, he didn't get a sentence set because his testimony is dependent upon his going home.

If you recall, he said that's what I'm hoping for, I'm going home, and that's common. We don't make a deal, we leave it open, so we can't say there's a deal, but you know what, there is a deal. He believed there is a deal, and he believes he's going home. He had 100 percent interest in testifying against the Defendant, 100 percent self-serving interest in testifying against the defendant.

. . .

I submit to you, he's not credible at all. He's also had what's referred to as crimen falsi. That's prior crimes of dishonesty, recent retail thefts in 2007, and again the three pending charges, two of which are involved in this case; therefore, he was listed as a co-defendant who again has every interest to testify for a self-serving purpose, and that's exactly what he did.

*Doc. 13-3* at 58-59. She returned to Bupp's self-serving interests later in her

closing:

So, back to Robert Bupp's testimony and again his self-serving interests. Let me remind you that when you are considering his credibility and his own interest in his wanting to go home, he could go home if that's the deal he gets for - - and that depends. That depends on how well he testified on behalf of the Commonwealth and against my client in a matter of 12 days give or take; not very good at math. He said his sentencing was March 19th. How good would he want to make his testimony? He wants to go home.

*Id.* at 60. Defense counsel pointed out additional times in her closing that Bupp

wanted to go home and that he has an interest in testifying for the Commonwealth.

*See Id.* at 64 (arguing that Bupp's testimony was not credible and pointing out "his

own self-interests of wanting to go home in about 12 days"); *Id.* at 64-65 (As to Pizza Express: "Now, Robert Bupp pled guilty to his crime.  Again, Robert Bupp has a great interest in testifying for the Commonwealth.").

In its closing, the Commonwealth also addressed Bupp's plea deal:

> Robert Bupp, the defense counsel keeps on saying he wants to go home.  Robert Bupp wants to go home, and I agree Robert Bupp wants to go home, but if you listened to his testimony, I asked him, did you received some type of deal from the Commonwealth, and he said one and a half to five years[6] is what I hope to get from the Commonwealth, and just go back on the calendar to January 21st of 2007.  Robert Bupp is not going home in 19 days.
> And another thing on Robert Bupp's, whether or not Robert Bupp is credible, the deal that he received, his deal entailed him pleading guilty to multiple felonious burglaries.  I mean it's not like he got off scot-free.  He still had to plead guilty to numerous burglaries, and he still had to do prison time, so, yes, of course he's getting consideration in regards for his testimony, but I'd ask you to look at what that consideration is and determine whether or not you want to completely discredit what he said.

*Doc. 13-3* at 74-75.


### c. Bupp's Sentencing.

On March 19, 2008, twelve days after Lynn's trial ended, Robert Bupp was sentenced, based on an agreed-upon recommendation, to 11½ to 23 months imprisonment. *Doc. 3-2* at 46-47.  And with credit for time served, Bupp was released that day or the next. *See Doc. 13-4* at 159-60 & 162.

_____

6 In fact, Bupp testified that the deal was 1½ to 7 years.

### d. Lynn's PCRA Petition and Hearing.

In his PCRA petition, Lynn claimed that his trial counsel was ineffective for failing to seek post-sentence relief based on newly discovered evidence that Bupp's sentencing agreement was significantly modified 12 days after Lynn's trial. *Doc. 3-2* at 97-99.  More specifically, he argued that he was denied due process and prejudiced by the Commonwealth's failure to disclose the true nature of Bupp's plea bargain to him during discovery and to the jury during his trial. *Doc. 42-1* at 5.

At the hearing on the PCRA petition, Lynn's trial counsel testified that at the time she filed post-trial motions, she did not have the transcript of Bupp's sentencing and, because there was no testimony regarding the issue, she thought the issue was better raised in a PCRA petition. *Doc. 13-4* at 144-45.  The former assistant district attorney who prosecuted Lynn testified at the PCRA hearing that he talked to Bupp immediately before Bupp testified at Lynn's trial. *Id.* at 157.  He testified that there was no concrete offer made to Bupp, but Bupp was told that if he testified truthfully he would be given consideration at his upcoming sentencing. *Id.* at 158.  He testified that the understanding was that Bupp could get a more favorable sentence than what had previously been offered if he testified truthfully at Lynn's trial. *Id.* at 159.  He also testified that at the time of his closing argument in Lynn's trial, he believed that Bupp had testified truthfully so his intent was that

49

Bupp would receive a lighter sentence than what had previously been negotiated. *Id.* at 162. But, he testified, he did not have any concrete numbers in mind, and he does not recall being involved in determining what consideration Bupp actually received at his sentencing. *Id.* at 161-62.

### e. Applicable Law Regarding the Commonwealth's Use of Perjured Testimony and Failure to Provide Exculpatory Evidence.

Lynn contends that Bupp got a better plea deal from the Commonwealth than was disclosed by the Commonwealth at his trial. Relying on *Naupue v. Illinois,* 360 U.S. 264, 269 (1959), and *Giglio v. United States,* 405 U.S. 150, 154 (1972), cases relating to the use of perjured testimony, and *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *United States v. Bagley*, 473 U.S. 667, 682 (1985), cases relating to the failure of the prosecution to turn over exculpatory evidence to the defense, Lynn claims that his trial counsel was ineffective for failing to seek post-sentence relief after she discovered the actual consideration the Commonwealth gave Bupp for his testimony.

"[A] conviction obtained through the use of false evidence, known to be such by representatives of the State," violates due process. *Naupue,* 360 U.S. at 269. "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* And this principle applies to false testimony that goes only to the credibility of a witness. *Id.* "A new trial is required if 'the false

testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio,* 405 U.S. at 154.  This standard may be "stated as a materiality standard under which the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt." *Bagley,* 473 U.S. at 679–80.  Thus, in order to make out a constitutional violation based on the use of perjured testimony, a petitioner must show that (1) the witness committed perjury; (2) the government knew or should have known of the perjury; (3) the testimony went uncorrected; and (4) there is any reasonable likelihood that the false testimony could have affected the verdict. *Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004).

Further, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  Following *Brady,* the Court made clear that the government is required to provide exculpatory evidence to the defense regardless of whether the defense makes a request for such evidence. *Bagley*, 473 U.S. at 682.  And impeachment evidence falls within the *Brady* rule. *Id.* at 676*; Giglio*, 405 U.S. at 154.  The prosecution has a duty to learn of exculpatory evidence known to others acting on the government's behalf. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  "A *Brady* violation occurs if: (1) the evidence at issue is favorable to the accused, because either exculpatory or impeaching; (2) the prosecution withheld it; and (3)

the defendant was prejudiced because the evidence was 'material.'" *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011).  "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682.  "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" *Smith v. Cain*, 132 S. Ct. 627, 630 (2012)(quoting *Kyles,* 514 U.S. at 434).

### f.  The PCRA Court's Decision.

The PCRA court rejected Lynn's claim that his trial counsel was ineffective for failing to raise a claim based on Bupp's actual plea deal.  It determined that both Lynn and the jury were aware that Bupp was hoping to get a reduced sentence based on his testimony:

> The record clearly shows that the defense was aware that the co-defendant was testifying hoping that he would get a reduced sentence if he testified at trial against Appellant. Furthermore, both attorneys, in their closing arguments, addressed the fact that co-defendant was going to receive consideration for his testimony.  Thus, it is reasonable to conclude that the jury was aware of this fact and took this information into consideration in weighting [sic] the credibility of the co-defendant during their deliberations.

*Doc. 13-4* at 237.  And the PCRA court concluded that counsel was not ineffective by failing to raise a *Brady* claim in post-sentence motions:

Contrary to Appellant's version of the facts, the record clearly indicates that the Commonwealth did not hide the fact that the co-defendant was going to receive a lighter sentence in consideration for his testimony at trial against Appellant. In fact, the prosecutor addressed this fact when he questioned the co-defendant and during his closing argument. Because the Commonwealth was very open about its dealings with the co-defendant and made the defense and jury aware of those dealings, it cannot be said that the Commonwealth failed to produce impeachment evidence. Thus, Appellant's constitutional rights, as interpreted by the Supreme Court in <u>Brady</u>, were not infringed. As a result, this Court properly concluded that attorney Walden had not provided ineffective assistance when she did not include in her Post-Sentence Motion for Relief on behalf of Appellant the fact that the co-defendant's sentence had been reduced. As a result, Appellant's appeal regarding this matter is without merit and should be denied.

*Id.* at 238.


### g. Lynn Is Not Entitled to Habeas Relief.

In this habeas case, Lynn contends that the transcript of Bupp's sentencing

conflicts with the prosecutor's assertion that there was no deal on the sex case.

Further, Lynn contends that the prosecutor misinformed the court and defense

counsel by asserting that Bupp's plea deal involved only three burglaries when, in

fact, it included the burglaries, the sex offense, and the two retail thefts. It is clear,

however, that defense counsel was aware of Bupp's charges relating to failure to

register as a sexual offender, as that charge was discussed at the two sidebar

conferences. Further, the nature of the sex offense case was not revealed to the

jury because the trial court ruled that defense counsel could not reveal the nature of that charge to the jury.  As to the two retail thefts, although it was not clear from his testimony that he was still waiting to be sentenced on those charges, Bupp testified that he was convicted of those charges.

Further, while Lynn contends that neither the defense nor the jury was told that Bupp could earn a downward departure based on his testimony, defense counsel cross-examined Bupp about his deal and brought out that Bupp was hoping to receive a lighter sentence for his testimony against Lynn.  In fact, defense counsel elicited from Bupp that he hoped he would be going home.

Given the record as a whole and specifically Bupp's testimony that he believed the was going to get consideration on his sentence for his testimony against Lynn and that he hoped to be going home, we cannot say that the result of the proceeding would have been different had the nature of the plea agreement been more fully and accurately set forth to either the defense or to the jury.  Thus, it was reasonable for the PCRA court to determine that Lynn's counsel was not ineffective by failing to raise the issue in post-trial motions.  Accordingly, Lynn is not entitled to habeas relief on this claim of ineffective assistance of counsel.

At the outset of its discussion, the PCRA court noted that Lynn's ineffective-assistance-of-counsel claim was based on an argument that he was denied due process by the prosecutor failing to disclose during discovery and at trial Bupp's

plea bargain.  But in its decision it only explicitly mentioned *Brady* and *Bagley*.  It did not explicitly mention *Naupe* or *Giglio*.  In any event, for the reasons discussed below, even under a *de novo* standard of review, Lynn is not entitled to habeas corpus relief on the claim that counsel was ineffective for failing to raise a *Naupe/Giglio* claim in post-sentence motions.

Bupp's testimony was not completely accurate as to the nature of his plea deal.  For example, he testified that he pleaded guilty to retail theft in January of 2007, whereas his guilty plea was August of 2007.  Also, in response to questions by the court, Bupp stated that his plea deal was for two burglary convictions, whereas the deal was actually for three burglary convictions, two retail theft convictions, and a conviction for failure to register as a sex offender.  But the inaccuracies in Bupp's testimony seem to stem from the nature of the questions posed to Bupp.  While Bupp may have been mistaken or confused, Lynn has not established that Bupp committed perjury.[7]  Nor, given Bupp's testimony that he believed that he was going to get consideration on his sentence for his testimony against Lynn and that he hoped to be going home, can we say that there is any

---

[7] "Perjury occurs when a witness gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Prosdocimo v. Sec'y, Pennsylvania Dep't of Corr.*, 458 F. App'x 141, 147 (3d Cir. 2012)(internal quotation marks omitted)(quoting *United States v. Hoffecker,* 530 F.3d 137, 183 (3d Cir. 2008), and *United States v. Dunnigan,* 507 U.S. 87, 94 (1993)).

reasonable likelihood that any falsity in Bupp's testimony could have affected the verdict. And so Lynn has not established that he was prejudiced by his counsel's failure to raise a *Naupe/Giglio* claim in post-sentence motions. Accordingly, Lynn is not entitled to habeas corpus relief on this claim.

We note that in his second supplemental reply, Lynn's counsel notes that Lynn instructed him to assert that the actions of the prosecutor in failing to correct Bupp's erroneous testimony regarding his deal with the Commonwealth and in inaccurately minimizing that deal during his closing argument constituted prosecutorial misconduct. *Doc. 42* at 7. Such a claim, however, was not briefed in this court. Rather, the claim relating to the nature of Bupp's plea deal was presented and briefed to this court as an ineffective-assistance-of-counsel claim. And the mere mention that Lynn instructed counsel to assert that claim is not sufficient to brief the claim. Thus, we consider any such claim waived. In any event, even if not waived, for the following reasons, the claim does not warrant habeas relief.

First, as discussed above, Lynn has not established that Bupp committed perjury, and given Bupp's testimony that he believed the was going to get consideration on his sentence for his testimony and that he hoped to be going home, we cannot we say that there is any reasonable likelihood that any falsity in Bupp's testimony could have affected the verdict.

Second, as to the prosecutor's comments during his closing argument, to warrant habeas relief, the prosecutor's comments must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 180 (1986)(quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)).  As such, we must examine "the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of [any] curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton,* 255 F.3d 95, 107 (3d Cir. 2001).

In this case, even assuming that the prosecutor's remarks about Bupp's plea deal were improper, taken in the context of the record as a whole, the remarks were not so egregious that Lynn was deprived of a fair trial.  Afterall, what is important about the plea deal is not exactly when Bupp was released or was going to be released, but that, as he testified, Bupp thought he was going to get a lighter sentence in exchange for his testimony.  Because the prosecutor's remarks did not deprive Lynn of a fair trial, Lynn is not entitled to habeas relief on such a claim.

### 3. Merger.

As to Jim's Auto Repair, the jury found Lynn guilty of burglary, two counts of theft (one as to the Jeep and one as to the tools), and two counts of receiving stolen property (one as to the Jeep and one as to the tools). *Doc. 13-3* at 103-104.

The judge later sentenced Lynn to 24 to 48 months for burglary of Jim's Auto Repair. *Doc. 2-1* at 98. Noting that the theft convictions and the conviction for receiving stolen property as to the tools merged for sentencing purposes with the burglary conviction, the judge did not impose any sentence for those convictions. *Id.* The judge did, however, impose a sentence of 24 to 48 months on the receiving stolen property conviction as to the Jeep. *Id.* Lynn claims that his counsel was ineffective for failing to raise and challenge the issue of merger of the receiving stolen property charge as to the Jeep on appeal.[8]

After setting forth the parties' contentions with regard to the merger issue, the PCRA court set forth the applicable Pennsylvania law on merger:

> It is well settled law that only one sentence may be imposed when the offenses the defendant is charge with merge into one another. *See,* Commonwealth v. Staples, 471 A.2d 847 (Pa.Super. 1984). Two convictions merge into one another if (1) the crimes constitute greater and lesser offenses and (2) the crimes charges are based on the same facts. *See,* Commonwealth v. Shank, 883 A.2d 658 (Pa.Super. 2005). Sentences are appropriate for merger when the same facts support conviction for more than one offense, the elements of the lesser offense are all included within the elements of the greater offense, and the greater offense includes at least one additional element. Where both offenses require proof of at

---

[8] In his petition, Lynn frames his claim as a claim that his counsel was ineffective for failing to raise the issue in either post-sentence motions or on appeal. But Lynn's counsel did raise the merger issue in post-sentence motions. *See Doc. 2-2* at 7. And Lynn acknowledges such at certain points in his briefing. *See Doc. 2* at 42. Thus, any claim based on counsel failing to raise the issue in post-sentence motions is patently without merit, and we confine our analysis to the claim that counsel was ineffective by not raising the issue on direct appeal.

> least one element that is different, the sentences for those
> offenses do not merge. *See*, Commonwealth v. Johnson, 874
> A.2d 66 (Pa.Super. 2005).  Merger is inapplicable and, as a
> result, different sentences may be imposed when two crimes
> have occurred. Two crimes occur when a criminal act has been
> committed, broken off, and the resumed. *See,* Shank.

*Doc. 13-4* at 239.  The PCRA court then reviewed Lynn's convictions and

sentences as to Jim's Auto Repair. *Id.* at 240.  It then compared the elements of the

crime of receiving stolen property and the elements of theft and concluded that

because each requires proof of at least one different element, the offenses cannot

merge. *Id.*  The PCRA court also concluded there was no merger because the

crimes took place at different times as there was a break in Lynn's conduct:

> In Appellant's case, two crimes took place because his criminal
> actions were not continuous and as such cannot merge.  Based
> on the facts established at trial, Appellant stole the Jeep
> Cherokee at some point before 4:00 a.m. on Jan. 21, 2007.
> After stealing the vehicle he went back to the place where he
> was residing.  Later that morning, at approximately 10:30 a.m.,
> Sergeant David Lash observed the same Jeep Grand Cherokee
> driving south on North George St. near East 7th Ave.  Lash
> followed the automobile and found it in an alley near 922 North
> Duke Street.  At that time, Jeffery J. Clements was driving the
> Jeep, Appellant was the front seat passenger, and Robert A.
> Bupp was the rear seat passenger.  As Clements tried to put the
> vehicle in reverse, Appellant began pushing him out of the
> driver's door.  Clements and Bupp exited the vehicle and were
> taken into custody.  Appellant fled in the vehicle and left the
> area.  Later, police officers found Appellant hiding on the roof
> of a building located at 1114 North George St. in York, Pa.
> The Jeep was recovered parked at 53 Parkway Blvd.  Thus, it is
> clear then that there was a break in conduct in Appellant's acts:
> he first stole the Jeep Cherokee and several hours later, while
> another person was driving the same vehicle, he re-possessed

the stolen car.  Therefore, two crimes took place: theft and
receiving stolen property.

*Id.* at 240-41.  Accordingly, the PCRA court concluded that Lynn's ineffective-

assistance-of-counsel claim based on the merger argument was without merit. *Id.* at

241.  The Pennsylvania Superior Court adopted the PCRA court's opinion as its

own except, noting that the thrust of Lynn's claim was that his receiving stolen

property conviction should have merged with his burglary conviction and that the

offense of receiving stolen property can merge with a related, underlying burglary,

it rejected as irrelevant the PCRA court's element-by-element analysis of the

crimes of theft and receiving stolen property.  *Id.* at 260-61 n.6.  The Superior

Court nevertheless agreed with the PCRA court's conclusion that the receiving

stolen property conviction as to the Jeep arose from a separate criminal episode

and therefore did not merge with the burglary conviction. *Id.*

Lynn contends that although he was not driving the Jeep when he first

encountered the police, there is no evidence that he ever gave up possession of the

Jeep, and, thus, he could not have repossessed the Jeep as the PCRA court found.

According to Lynn, his counsel was ineffective for failing to raise the merger issue

on appeal, and he would have prevailed on the claim had it been properly presented

to the state courts.  While the argument that Lynn never gave up possession of the

Jeep may be a reasonable one, under the "doubly deferential" standard that applies

to a *Strickland* claim evaluated under 28 U.S.C. § 2254(d)(1), *Knowles*, 556 U.S. at

123, the PCRA Court's determination that Lynn was not prejudiced by counsel's failure to raise the merger issue on appeal because the merger issue was without merit was not unreasonable.  Nor has Lynn shown that the PCRA Court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state proceedings.  Accordingly, Lynn is not entitled to habeas relief on this claim of ineffective assistance of counsel.

**4. Prior Bad Acts.**

Lynn claims that his trial counsel provided ineffective assistance of counsel by failing to object, by failing to request a curative instruction, and by failing to move for a mistrial when evidence of his prior bad acts, drug use, and unproved crimes was brought out at trial.  He identifies eight pieces of evidence to which he contends his trial counsel should have objected, should have requested a cautionary instruction, or should have moved for a mistrial: (1) Officer Jones's testimony that after Lynn was in custody, he searched Lynn and found a little baggie of marijuana; (2) Robert Bupp's testimony that everybody at the house smoked crack; (3) Bupp's testimony that crack is the reason they would burglarize stuff; (4) Bupp's testimony that on the night he and Lynn burglarized Pizza Express, they were looking to steal a generator; (5) Bupp's testimony that on the morning after the  burglary of Jim's Auto Repair, they used the Jeep to drive to a Rutter's store,

where Lynn stole items; (6) Bupp's testimony that at the time the police stopped the Jeep, they were going into town to get drugs; (7) Milton Dean's testimony portraying Sherry Jones's house as a party house and his statement that they smoked marijuana; (8) Officer Allen's testimony that in Lynn's statement to the police about what happened on the night of the burglary of Jim's Auto Repair, Lynn mentioned going to a bar, doing crack cocaine, and trying to buy crack cocaine. *See Doc. 27* at 55-56 and *Doc. 42* at 14-18. Lynn contends that this evidence was inadmissible under Pa.R.E. 404(b) and prejudiced him because it portrayed him as a drug addict and a person of bad character.

Pa.R.E. 404(b) prohibits the Commonwealth from introducing evidence of a defendant's prior bad acts or crimes to prove the defendant's character in order to show that on a particular occasion the defendant acted in accordance with that character. Pa.R.E. 404(b)(1). But the Commonwealth may introduce evidence of other crimes or bad acts by a defendant for purposes other than to prove the defendant's character or propensity to commit crime. Under Pa.R.E. 404(b)(2), such evidence may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Nevertheless, Pennsylvania courts may admit such evidence "only upon a showing that the probative value of the evidence outweighs its potential for prejudice." Pa.R.E. 404(b) (3). The Commonwealth must also provide pretrial notice of its

intention to introduce such evidence. Pa.R.E. 404(b)(3).  In addition to the reasons

set forth in Rule 404(b)(2), evidence of other crimes or bad acts  "may also be

admissible to prove 'part of the chain or sequence of events which became part of

the history of the case.'" *Wilson v. Vaughn*, 533 F.3d 208, 217 (3d Cir. 2008)

(quoting *Com. v. Williams*, 594 Pa. 366, 397 (2007)).

   Unlike the prior ineffective-assistance of counsel claims, the state court did

not decide this claim on the merits.  Thus, instead of applying the highly

deferential standard of review under 28 U.S.C. § 2254(d), we apply a *de novo*

standard of review.[9]

   The Commonwealth contends that much of the evidence was admissible

under Pa.R.E. 404(b)(2).  For example, the Commonwealth argues that evidence of

drug use was admissible to show motive, *i.e.*, that Lynn was committing thefts to

support his drug habit.  We agree that some of the evidence was likely admissible

to prove motive.  In addition some of the evidence was likely admissible for other

reasons.  For example, the testimony that Bupp and Lynn were looking to steal a

generator on the night of the Pizza Express burglary may go to plan.  Still, under

Pa.R.E. 404(b)(2), such evidence is admissible only if its probative value

---

[9] Lynn procedurally defaulted this claim, but, at the hearing on November 12, 2013, the respondent expressly waived the procedural default argument.  The parties agreed as to which claims would go forward.  Further, counsel agreed that the claims would go forward on the record.  Thus, Lynn has not requested a hearing on the merits of this claim.

outweighs its potential for unfair prejudice.  In this case, because there was no

objection to the evidence, the trial court did not make such a determination.  But

considering that much of the evidence was elicited in response to questions from

the court itself, it seems unlikely that the court would have sustained an objection

to the testimony or found that its probative value was outweighed by its potential

for unfair prejudice.  And it is even more unlikely that the court would have

granted a mistrial.  But even if the court was not likely to sustain an objection to

the evidence or to grant a mistrial, there is no reason to believe that, if requested,

the court would not have given an appropriate limiting instruction as to the proper

use of the evidence. *See Comment to Pa.R.E. 404(b)(2)* (noting that when evidence

is admitted for one of the purposes allowed under 404(b)(2), "the party against

whom it is offered is entitled, upon request, to a limiting instruction.).[10]

     The Commonwealth also contends that Lynn's trial counsel had a tactical

reason for not objecting to or requesting a cautionary instruction regarding the

evidence at issue, i.e., because she thought the testimony was helpful to show that

---

10 Lynn correctly notes that under Pa.R.E. 404(b)(3), the Commonwealth must provide "reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial."  That provision, however, is not applicable to much of the evidence, which was elicited by the court itself.  Also, whether Lynn's statements to the police were admissible was the subject of a pretrial motion in limine. *See Doc. 13-1* at 154-159.  And Lynn's trial counsel testified at the PCRA hearing that she thought Lynn's statement to Officer Allen was part of the discovery that she received. *Id.* at 146.  So it appears that the defense was not surprised by the testimony about those statements.

the witnesses were not credible.  The Commonwealth further asserts that defense

counsel may not have wanted to highlight and draw attention to the evidence,

which was only mentioned in passing and in some instances was focused primarily

on the conduct of a Commonwealth witness rather than Lynn.  Lynn's trial counsel

testified at the PCRA hearing that, in her opinion, the questions about drug use

were going to be used against the credibility of the witnesses, and, for that reason

she did not ask for a special jury instruction. *Doc. 13-4* at 145 and 151.  And when

asked why she did not raise certain issues on appeal, defense counsel testified that

she raised the issues that she thought had the most merit and she did not raise other

issues because they did not have merit. *Id.* at 151-52.

    The testimony of Lynn's trial counsel was general and did not focus on the

prior bad acts evidence.  Nevertheless, under the first prong of the *Strickland*

analysis, there is a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance." *Strickland,* 466 U.S. at 689.  And "the

defendant must overcome the presumption that, under the circumstances, the

challenged action '"might be considered sound trial strategy."' *Id.* (quoting *Michel*

*v. State of La.*, 350 U.S. 91, 101 (1955)).  The Court is required to not only give the

attorney "the benefit of the doubt," "but to affirmatively entertain the range of

possible 'reasons . . . counsel may have had for proceeding as [he or she] did."

*Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011).  The decision not to object or

to seek a cautionary instruction as to prior bad acts evidence may be reasonable in certain circumstances. *See Buehl v. Vaughn*, 166 F.3d 163, 170 (3d Cir. 1999)("In some circumstances, [a cautionary] instruction may be strongly advisable; in others, counsel may reasonably conclude that it is strategically preferable to omit such a request since the instruction might have the undesired effect of highlighting the other crimes evidence.").

In this case, while defense counsel's testimony was not very specific, it provides a reasonable basis for not objecting to and not requesting a cautionary instruction at the time of the admission of most of the prior bad acts evidence—defense counsel felt the testimony was helpful to the defense in that it painted the Commonwealth witnesses as not credible. And the references to the prior bad acts and unproved crimes of Lynn, even if not admissible, were fleeting. Thus, we conclude that counsel had a reasonable strategic basis for not objecting to the testimony and not requesting a cautionary instruction at the time such evidence was elicited. Yet, it is difficult to understand why she did not request a limiting instruction at the end of the trial about the proper use of such evidence, and her testimony does not specifically cover that. While that too could have drawn attention to the evidence, such an instruction could have been worded generally so as to provide guidance to the jury without unduly highlighting the evidence. Nevertheless, even if Lynn succeeds on the first prong of the *Strickland* analysis in

this regard, for the reasons set forth below, he fails on the second prong—the prejudice prong—of that analysis.

Lynn characterizes the evidence against him as thin.  But, in fact, the evidence against Lynn on the charges of which he was convicted was quite strong. As to Choice Tobacco, there were photographs from a surveillance video from which the jury could reasonably conclude based on the distinctive markings on the coat worn by the burglar that Lynn was the burglar.  As to the Blue Moon Restaurant, there was testimony that Lynn brought home bottles of alcohol that had red pour spouts like on some of the bottles taken from the Blue Moon.  In fact, Bupp testified that one night Lynn brought home 20 bottles of liquor, some with red pour spouts.  Further, a trash can like those taken from the Blue Moon was found in Sherry Jones's garage, and detective Fetrow testified that the owner of the Blue Moon  identified the bottle of liquor that was found in Jones's computer room, which bottle Jones testified Lynn brought into the house.  And Lynn provided information to Detective Asper about the burglary at the Blue Moon.  As to Pizza Express, Bupp testified that he and Lynn broke into the freezer of Pizza Express, the stolen pepperoni and chicken were found in a freezer in the basement of where Lynn was staying, and Lynn gave a statement to police indicating that he

had knowledge of the Pizza Express burglary.[11]   As to Jim's Auto Repair, Bupp

testified that he and Lynn broke into Jim's Auto Repair, stolen tools and inspection

stickers were found in Lynn's bedroom, and additional stolen tools were found in

the garage at the residence where Lynn stayed.  Further, Lynn was spotted by the

police in the Jeep stolen from Jim's Auto Repair, and when confronted by the

police, he kicked the driver out of the Jeep and fled.

Given the strong evidence against Lynn, he cannot establish prejudice, *i.e.*, a

reasonable probability that the result of trial would have been different if the

evidence at issue had not been admitted or if a limiting instruction had been given.

This conclusion is buttressed by the fact that the jury found Lynn not guilty of

burglary and theft with respect to the Blue Moon Restaurant.  This shows that the

jury carefully considered the evidence as to each charge, rather than finding Lynn

guilty based on his prior bad acts.  Accordingly, Lynn is not entitled to habeas

relief on this claim of ineffective assistance of counsel.

---

11 Lynn was not convicted of burglary as to Pizza Express.  Although Lynn had
been charged with burglary as to Pizza Express, the burglary charge was not given
to the jury.  As to Pizza Express, Lynn was convicted of theft, receiving stolen
property, and criminal mischief.

## IV.  Recommendation.

Accordingly, for the foregoing reasons, we recommend that the petition for a writ of habeas corpus be denied.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 16th day of April, 2014.

_S/Susan E. Schwab_
Susan E. Schwab
United States Magistrate Judge